ATLANTIC TELEPHONE COMPANY, Petitioner,

v.

PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,

Chesapeake & Potomac Telephone Company, Intervenor.

No. 12379.

District of Columbia Court of Appeals.

Argued May 4, 1978.

Decided Aug. 1, 1978.

---

Ruth S. Baker, Washington, D. C., with whom Ian D. Volner, Washington, D. C., was on brief, for petitioner. Edwin B. Spievack, Washington, D. C., also entered an appearance for petitioner.

John R. Risher, Jr., Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, and James T. McManus, Asst. Corp. Counsel, Washington, D. C., submitted on brief, and did not participate at oral argument for respondent.

Alfred Winchell Whittaker, Washington, D. C., with whom Lee A. Satterfield and Robert J. Park, Washington, D. C., were on brief, for intervenor.

Before GALLAGHER, YEAGLEY and MACK, Associate Judges.

YEAGLEY, Associate Judge:

This appeal involves the lawfulness of certain telephone rates proposed by the Chesapeake and Potomac Telephone Company (C&P) and approved by the Public Service Commission (the Commission). The specific rates at issue involve a new private branch exchange service known as Dimension PBX.

The proceeding below was initiated on December 29, 1975, when C&P filed with the Commission a proposed tariff offering Dimension PBX service on a two-tier pricing basis. Petitioner Atlantic Telephone Company (Atlantic), an unregulated competitor of C&P, intervened in opposition to the Dimension filing. The only other party to the proceeding was People's Counsel, the statutory representative of the consumer, D.C. Code 1977 Supp., § 43–205.

Evidentiary hearings began on August 9, 1976, and concluded on August 13, 1976. In the five days of hearings, the parties devel-

oped an extensive record. On March 30, 1977, the Commission issued its proposed opinion and order (Order No. 5870). After considering exceptions filed by Atlantic, the Commission, on April 29, 1977, issued Order No. 5874 denying all exceptions and adopting Order No. 5870 as its final order. Atlantic petitioned for reconsideration and on June 22, 1977, the Commission issued Order No. 5889 denying that petition. Atlantic then petitioned this court for review of the Commission's orders and C&P intervened. People's Counsel is not a party to this appeal.

In its decision, the Commission authorized C&P to offer Dimension customers the option of two types of payment plans: (1) a month-to-month payment plan for the term of the service, and (2) a two-tier payment plan. The conventional month-to-month plan requires the customer to pay a single charge designed to recover both the nonrecurring capital costs and the on-going operating expenses. That charge remains subject to revision and payments cease only when service is discontinued.

The two-tier pricing plan establishes a fixed price [1] for the equipment used in providing the service (tier A), and a variable price for maintenance services (tier B). The fixed price, or tier A portion, is established by determining the capital costs which C&P anticipates will be incurred over the estimated life of the equipment. The customer is given the option of paying those capital costs over a three, five, seven or ten year period. As the cost for the equipment and installation labor increases, C&P will incur higher nonrecurring capital costs in providing Dimension service to new customers. Because the tier A rate paid by each customer is based on the capital cost of the equipment he receives, tier A rates will vary among Dimension customers. The two-tier customer is obligated to pay the tier A element for the entire payment period that he selects. If the customer discontinues service prior to the expiration of the tier A period, he must pay a termination charge equal to the present value of the remaining tier A payment.

The second component, or tier B portion, of the two-tier plan is designed to recover all on-going expenses associated with Dimension service. Accordingly, the subscriber is obligated to pay the tier B rates during the entire period he receives Dimension service. The tier B rates are designed to be the same for all two-tier subscribers.

Atlantic attacks the Commission's order establishing two-tier rates for Dimension PBX on two grounds. The first is that the Commission exceeded its authority by establishing rates for the Dimension service in the absence of record evidence showing that the rates adequately reflected the true cost of providing the service. The second is that the two-tier rates are inherently discriminatory. Finding no merit in Atlantic's claims, we affirm the order of the Commission.

I

We note at the outset that the scope of our review of the Commission's order is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings are unreasonable, arbitrary, or capricious." D.C. Code 1973, § 43–706. *See, e. g., Watergate Improvement Associates v. Public Service Commission*, D.C.App., 326 A.2d 778, 783 (1974); *Goodman v. Public Service Commission*, D.C.App., 309 A.2d 97, 100 (1973). "Our function is normally exhausted when we have determined that the Commission has respected procedural require-

---

1. By contracting with a customer to provide Dimension service at a fixed tier A rate, C&P gives up its right to apply for a rate increase under D.C. Code 1973, §§ 43–323 and 43–401. The fact that the tier A rate is fixed by the contract between C&P and the two-tier customer does not, however, impair the Commission's authority to revise those rates under D.C. Code 1973, §§ 43–408 to 43–411. Section 9 of the contract between C&P and the Dimension customer recognizes the power of the Commission to modify tier A rates. The circumstances under which the Commission may revise tier A rates are discussed in section III of this opinion.

ments, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations." *Williams v. Washington Metropolitan Area Transit Commission*, 134 U.S.App. D.C. 342, 362, 415 F.2d 922, 942 (1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969). And, the burden is on Atlantic to show that the rate order is unlawful because it is unjust and unreasonable in its consequences. *Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission*, D.C.App., 332 A.2d 53, 56 (1975).

## II

■ Atlantic argued below that because the prices paid by C&P to Western Electric[2] for PBX equipment were unreasonably low, the costs used in developing the tier A rates were understated.[3] This, according to Atlantic, rendered the tier A rates unjust and unreasonable. After analyzing Western Electric's pricing system, the Commission concluded that the C&P Dimension rates were just and reasonable. Atlantic claims that in reaching its conclusion, the Commission relied improperly on evidence which was not a part of the record, failed to make a necessary finding, and misallocated the burden of proving that the price charged by Western Electric for PBX equipment adequately reflected its cost.

The record indicates that in pricing each item of Dimension equipment, Western Electric follows the same two-step process that is followed in the pricing of all other Western Electric products. First, Western Electric determines the direct manufacturing ("standard") cost of each product. Second, the remaining ("nonstandard")

costs, attributable to factors such as research and development, general expenses, income taxes, and return on investment are allocated to the various products through the use of a pricing factor.

To determine this pricing factor, Western Electric groups products into 13 different lines. Each product is assigned to a line on the basis of the relative homogeneity of the products with respect to manufacturing processes, technology, and investment expense characteristics. Western Electric then develops, on an aggregate basis, the ratio of nonstandard costs to standard costs for each product line. That percentage becomes the "mark-up," or pricing factor, for each item within the product line. Atlantic's contention below was that Western Electric improperly classified Dimension PBX equipment in the Customer Premise Product line so that other equipment in that line, such as residential telephone sets, would bear a disproportionate share of Dimension's research and development costs. In this manner, Atlantic claimed, Western Electric had priced Dimension equipment below cost.

■ In its decision, the Commission set forth its reasons for rejecting Atlantic's contentions:

In this instance, management has advanced reasoned arguments for placing PBX's (including Dimension) in the Customer Premise Product Line. From a technical standpoint, Dimension PBX has many similarities to other equipment within that product line. Moreover, because Dimension PBX and the other constituents of the Customer Premise Product Line display some expense homogeneity, this product line's price factor is not

**2.** Western Electric is the manufacturing subsidiary of the American Telephone & Telegraph Company (AT&T), and sells virtually all of its products to AT&T and its operating subsidiaries. C&P is an operating subsidiary of AT&T.

**3.** In determining whether rates are just and reasonable, the Commission may consider

whether the price at which the utility has purchased materials or equipment from an affiliated company is reasonable. *See State ex rel. Util. Comm'n v. Gen. Tel. Co. of Southeast*, 281 N.C. 318, 335, 189 S.E.2d 705, 722 (1972); *Gen. Tel. Co. of Upstate New York, Inc. v. Lundy*, 17 N.Y.2d 373, 377–78, 271 N.Y.S.2d 216, 221–222, 218 N.E.2d 274, 278–79 (1966).

distorted by inclusion of PBX's including Dimension. . . .

Nonetheless, we would be seriously concerned if, as Atlantic contends, Dimension sales will not recoup this service's research and development costs within a reasonable period. That, however, is not the case. The best information available is that Dimension rates will recover these costs by 1981, at the latest. The reasoning and conclusions of the Commission are sound and adequately supported in the record. Atlantic claims, however, that the decision of the Commission must be reversed because the Commission failed to make a specific finding that the price charged by Western Electric was "cost compensatory." We disagree. Once the Commission found that the price charged by Western Electric was sufficient to recover research and development costs within a reasonable period of time, there was an adequate basis for the Commission to conclude that the rates were just and reasonable.

Atlantic also claims that the Commission based its finding that the Dimension rates were reasonable on evidence which was not in the record. In its decision, the Commission noted that "independent investigations have endorsed Western Electric's pricing procedures as reasonable and not used to price competitive equipment below cost." Contrary to Atlantic's assertions, however, the results of the independent investigations did not provide the basis for the Commission's finding that the prices charged for the Dimension equipment were reasonable. Rather, the Commission based its findings on detailed record testimony concerning the manner in which the price for the Dimension equipment was computed. In its order denying Atlantic's petition for reconsideration, the Commission noted that the results of the independent investigations were merely corroborative of its findings.

■ Finally, Atlantic claims that the Commission improperly placed on it the burden of proving that Western Electric had underpriced the Dimension equipment sold to C&P. Under the District of Columbia Administrative Procedure Act, the proponent of a rate order has the burden of proving that the proposed rates are just and reasonable. See D.C. Code 1977 Supp., § 1–1503. And, the utility must show that expenditures relied upon as a basis for the rates are themselves reasonable.[4] *Pacific Northwest Bell Telephone Co. v. Sabin*, 21 Or.App. 200, 534 P.2d 984, 991 (1975); *State ex rel. Utilities Commission v. General Telephone Co. of Southeast*, 281 N.C. 318, 336, 189 S.E.2d 705, 723 (1972). Hence, Atlantic correctly asserts that C&P bore the burden of proving that the prices paid to Western Electric for the Dimension equipment were reasonable. In denying Atlantic's petition for reconsideration, however, the Commission flatly rejected the claim that it had placed on Atlantic the burden of proof with regard to the Western Electric pricing issue.

Considered in its entirety, then, Opinion 5870 reflects the Commission's view that the Company met its burden of proving that Western Electric's pricing practice is reasonable. On this point, the Company's case was judged to be the most persuasive. Although the Commission expressed its belief that Atlantic's attack was insufficient to overcome the Company's case, the Commission was not requiring Atlantic to shoulder the burden of proof. Rather, the Commission simply found that Atlantic's criticisms of the Western Electric pricing methodology were unconvincing.

Our review of the record indicates that the Commission properly allocated the burden of proof with regard to the Western Electric pricing issue.

---

4. When material and services are purchased on the open market, the contract price is usually accepted without further inquiry. When, however, the utility and the supplier are affiliated— as is true in this case—close scrutiny of the price paid by the utility is usually required. *See General Telephone Co. of Upstate New*

## III

Atlantic claims[5] that the Dimension rates established by the Commission unlawfully discriminate against two classes of customers: (1) customers who receive service pursuant to a monthly rate plan, and (2) future two-tier Dimension customers who will pay higher tier A rates.[6]

Under the District of Columbia Public Utility Act, the charge for any service furnished by a public utility must be nondiscriminatory. D.C. Code 1973, § 43–301. Not every variation in the rate charged for a particular service, however, supports a claim of unlawful discrimination. See Associated Press v. Federal Communications Commission, 146 U.S.App.D.C. 361, 371, 452 F.2d 1290, 1300 (1971). In determining whether there has been discrimination within the meaning of § 43–301, the Commission must consider whether customers have paid different amounts for the same service under the same circumstances.

Riegel v. Public Utilities Commission, 60 U.S.App.D.C. 111, 48, F.2d 1023 cert. denied, 284 U.S. 644, 52 S.Ct. 24, 76 L.Ed. 548 (1931). So long as the classifications are reasonable, a difference in rates may exist between different classes of customers. Id. And, the differences may be based on "the nature, time, and pattern of use so as to achieve reasonable efficiency and economic operation." Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission, supra at 57.

Atlantic contends that vintaging among two-tier ratepayers is discriminatory because rather than selling or leasing equipment, C&P is providing a service which is the same for all Dimension customers, regardless of the differences in capital costs incurred by C&P. In its decision, the Commission found that differentials in tier A rates would be based on charges of investment costs, and that each generation of Dimension customers would bear the costs

---

York, Inc. v. Lundy, supra, 17 N.Y.2d at 376, 271 N.Y.S.2d at 220, 218 N.E.2d at 277.

**5.** C&P contends that Atlantic does not have standing to challenge the two-tier rate structure as unlawfully discriminatory. Under D.C. Code 1973, § 43–705, any "person or corporation affected by any final order or decision of the Commission" has standing to seek review of the Commission's order. In this case, the record indicates that Atlantic competes with C&P in the market for private branch exchange service, but is not a telephone ratepayer in the District of Columbia. C&P's position is that only a telephone ratepayer can challenge the Commission's finding because if there is discrimination it is against ratepayers and not competitors. In our view, C&P misconceives the scope of § 43–705.

Section 43–705 is an explicit provision, in a regulatory statute, conferring standing on those "affected" by the final order of the agency. See United States v. Pub. Util. Comm'n, 80 U.S.App.D.C. 227, 231, 151 F.2d 609, 613 (1945), cert. denied, 331 U.S. 816, 67 S.Ct. 1305, 91 L.Ed. 1835 (1947). Under such statutory standing provisions, a party need not be within the "zone of interests" protected by a regulatory provision in order to challenge agency action on that basis. See Ass'n of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153 n. 1, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Fed. Communications Comm'n v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Associated In-

dus. v. Ickes, 2 Cir., 134 F.2d 694, vacated on suggestion of mootness, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943). To the contrary, provisions such as § 43–705 authorize a party affected by a Commission order to raise "any relevant question of law in respect of the order of the Commission." Fed. Communications Comm'n v. Sanders Bros. Radio Station, supra, 309 U.S. at 477, 60 S.Ct. at 698. As a competitor, Atlantic was affected by the rate level established by the Commission for Dimension PBX service and, therefore, may raise any issue relevant to the lawfulness of the Commission's actions. Id.

C&P's reliance on Telephone Users Ass'n v. Pub. Service Comm'n, D.C.App., 304 A.2d 293, 296, cert. denied, 415 U.S. 933, 94 S.Ct. 1448, 39 L.Ed.2d 492 (1973), is misplaced. In that case, we found that an association which neither received telephone service nor competed with the company providing service did not have standing to seek review of a Commission order setting telephone rates. In other words, our conclusion was based on the fact that the association which sought review was simply not affected by the Commission's action.

**6.** Atlantic also argues before this court that two-tier Dimension rates are discriminatory because they result in mismatching of revenues and expenses. This claim was not raised in Atlantic's application for reconsideration and therefore cannot be considered on appeal. D.C. Code 1973, § 43–704.

imposed by it on C&P.[7] In our view, these findings support the Commission's conclusion that different generations of two-tier ratepayers will receive Dimension service under different circumstances. We therefore hold that the two-tier rate structure employed in this case does not discriminate against future Dimension users.

We also reject Atlantic's assertion that two-tier pricing discriminates against telephone subscribers who do not receive service on a fixed cost basis. Under a monthly rate plan, a customer is obligated to pay for a service only during the period of use. Under the two-tier system, customers must complete the stream of tier A payments regardless of the period of actual use. The Commission found, with substantial evidentiary support, that the different payment plans were in express recognition of the varying requirements of Dimension customers. Hence, neither group takes service under the same or similar conditions.

Moreover, the Commission formulated its order so as to ensure that customers who receive service on a monthly basis would not be prejudiced or disadvantaged by the use of the two-tier concept. One of the fears expressed by People's Counsel was that as tier A costs increased over time, the fixed rates might cause revenue deficiencies which C&P would try to recoup from customers of other services through an overall rate increase. In order to avoid the possibility of such cross-subsidization, the Commission imposed certain safeguards. First, the Commission increased the initial tier A rates proposed by C&P by 20% in order to provide a cushion against future cost increases. Second, the Commission required that C&P file a new tier A tariff at least once a year. And, if the costs of a Dimension PBX system should increase by more than 12% in a period of less than one year, a new tariff must again be filed. Finally, the Commission imposed the condition that in future cases involving the rates for other telephone services, any shortfalls in the recovery of Dimension costs must be ignored.

These safeguards should protect other C&P customers from any deficiencies which might result from the fixed tier A rates. And, should these safeguards prove so inadequate in practice as to render the Dimension rates unjust, unreasonable or discriminatory, the Commission has pursuant to D.C. Code 1973, §§ 43–408 to 43–411, the authority to order an increase in tier A rates.[8] Contrary to Atlantic's assertions, the contract between C&P and two-tier Dimension customers does not preclude the Commission from ordering an increase in tier A rates. Although the contract sets the rates at a fixed level, the Commission retains the power to revise any rate when such action is mandated by circumstances of public necessity. *Appalachian Power Co. v. Federal Power Commission*, 174 U.S.App. D.C. 100, 103 n. 13, 529 F.2d 342, 345 n. 13, *cert. denied*, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976); *Watergate Improvement Associates v. Public Service Commission*, *supra*, at 788. See *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipeline Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). Should the fixed level of tier A rates cause other customers to bear the cost of providing Dimension service to the two-tier user, the public interest would be sufficiently affected to justify an increase in tier A rates. See *Federal Power Commission v. Sierra Pacific Power Company*, *supra*, 350 U.S. at 355, 76 S.Ct. 368.

Finally, we note that *New England Telephone & Telegraph Co. v. Department of Public Utilities*, 363 N.E.2d 519 (Mass.1977),

---

**7.** There is substantial evidentiary support for these findings.

**8.** D.C. Code 1973, § 43–411 provides, in pertinent part:

If upon such investigation the rates, tolls, charges, schedules, or joint rates shall be found to be unjust, unreasonable, insufficient, or unjustly discriminatory, or to be preferential or otherwise in violation of any of the provisions of chapters 1–10 of this title, the commission shall have power to determine and by order fix and order to be substituted therefor such rate or rates, tolls, charges, or schedules as shall be just and reasonable.

does not support Atlantic's cause. In that case, the Supreme Judicial Court of Massachusetts held that a department order rejecting a two-tier rate structure as discriminatory was supported by substantial evidence and within the scope of the department's authority. The department's order was, however, based on factual findings not present on the record before us. There, the department had found that the fixed tier A rates would result in revenue deficiencies and in the subsidization of private branch exchange service by conventional users. On the basis of those findings, the department concluded that the rates were "inherently discriminatory because they insulate Dimension PBX customers from cost increases and shift the burden of any future PBX revenue deficiencies onto other classes of ratepayers." *Id.* at 523. And, in upholding the department's order, the court noted that if a method of safeguarding against cross-subsidization could be devised, the objections to a two-tier payment plan would be removed:

> If NET can propose a method by which cross-subsidization can be eliminated as a potential hazard, the department's various objections argued to us might be met. For example, it may be possible to identify and measure future deficiencies in tier A rates and it also may be possible to devise some practical method for eliminating any chance of cross-subsidization. In such a case, in effect, NET's shareholders would take the risk that the filed tier A rates would prove to be inadequate during the terms of its various agreements with customers involving the two-tiered payment plan. Alternatively, tier A rates might be made subject to adjustment in the event that there is a change in the rate of return, income taxes or depreciation, or any combination of these items, which calls for an adjustment in tier A rates so that any potential for

cross-subsidization might be eliminated. NET's use of a higher rate of return on its investment in this type of equipment (a position which is accepted by the department) indicates the presence of some leeway in the rating structures tending against the possibility of cross-subsidization. [*Id.* at 525.]

In this case, the Commission has devised a number of safeguards against cross-subsidization. And, as we indicated above, should those safeguards prove inadequate in practice, the Commission has the authority to adjust the tier A rates. Hence, unlike the Massachusetts court, we are not faced with the possibility of revenue deficiencies and cross-subsidization. We affirm the Commission's finding that the Dimension two-tier rates are nondiscriminatory.[9]

Finding no reversible error, the order of the Commission is

*Affirmed.*

9. Two-tier pricing schemes for Dimension service have been approved by public utility commissions in other jurisdictions. *E. g., Re Southern New England Tel. Co.,* 17 Pub.U.Rep. 4th 191 (1977); *Re New England Tel. & Telegraph Co.,* 16 Pub.U.Rep. 4th 379 (1976). In at least one other jurisdiction, a plan similar to the one advanced here has met with judicial approval. *Tele/Resources, Inc. v. Pub. Service Comm'n,* 58 A.D.2d 406, 396 N.Y.S.2d 906 (1977).